## DUKE POWER CO. et al. v. SOUTH CAROLINA TAX COMMISSION.*

No. 3906.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1936.

*Writ of certiorari denied 56 S. Ct. ——, 80 L. Ed. ——.

H. J. Haynsworth, of Greenville, S. C., and J. H. Marion, of Charlotte, N. C. (W. S. O'B. Robinson, Jr., and J. C. McGowan, both of Charlotte, N. C., on the brief), for appellants.

Claude K. Wingate, of Columbia, S. C. (John M. Daniel, Atty. Gen., and J. Fraser Lyon, of Columbia, S. C., on the brief), for appellees.

Before PARKER and NORTHCOTT, Circuit Judges, and COLEMAN, District Judge.

PARKER, Circuit Judge.

This is an appeal from a judgment sustaining demurrers and dismissing two consolidated actions instituted by the Duke Power Company and the affiliated Southern Public Utilities Company to recover taxes paid under protest pursuant to the South Carolina Power Tax Act (Act S. C. May 9, 1931, 37 St. at Large, p. 357 [Code 1932, § 2558 et seq.]), for the generation and sale of electric power during the month of November, 1933. Other actions have been instituted by the same parties in the court below to recover such taxes paid for other months, but have not been tried pending the final determination in these consolidated cases, which have been brought up on appeal for the purpose of determining the questions involved. After the decision below, the portion of the act authorizing the payment of taxes under protest and suit for their recovery was repealed by the Legislature of South Carolina; and a motion to dismiss the appeal has been made on the ground that the consent of the state to be sued has been withdrawn by the repealing act.

Three questions are presented for our determination by the motion and the appeal: (1) Whether, in view of the passage of the repealing act of the South Carolina Legislature, there is jurisdiction in the federal courts to proceed further with the hearing of the action; (2) if so, whether the South Carolina Power Tax Act should be construed as requiring that the generation tax imposed by it be applied to the current as generated, or merely to the current as sold after the elimination of station and line or system loss; and (3) whether, if the former construction be adopted, the act does not violate the due process and equal protection clauses of the Fourteenth Amendment by discriminating against those manufacturers of electricity who produce and sell their product within the state. We shall discuss these questions in the order in which they have been stated.

1. The question of jurisdiction.

The South Carolina Power Tax Act of May 9, 1931, provided, in section 4 thereof (brought forward as section 2561 of the Code of 1932), that the collection of the taxes thereby imposed should not be restrained or enjoined by any court or judge, but that any person claiming taxes required to be paid under the act to be unjust or illegal for any reason might pay such taxes under protest and sue for their recovery.[1] Appellants made payment of taxes under written protest, and promptly instituted suits for recovery pursuant to the provisions of this act. The case at bar was heard and decided in the court below on April 11, 1935 (Duke Power Co. v. Query (D.C.) 10 F.Supp. 669), as a test case to govern the other cases which were pending involving the same questions; but before appeal from the judgment could be taken the Legislature of South Carolina, on April 27, 1935, 39 St. at Large, p. 276, § 2, repealed the proviso of section 4 of the act, which forbade injunction and provided for payment under protest and suit for recovery.[2] The question which arises is whether the effect of this repealing act was to take away the right of appellants to proceed

[1] Section 4 of the Power Tax Act, brought forward as section 2561 of the Code of 1932, is as follows: "§ 4. [Now section 2561, Code of Laws S.C. 1932] Effect of Invalidity of Clause, Etc.—to Pay Under Protest.—That if any clause, sentence, paragraph or part of this Act shall, for any reason, be adjudged by any Court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder of this Act, but shall be confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgment shall have been rendered. No caption of any Section or set of Sections shall in any way affect the interpretation of this Act or any part thereof: Provided, That the collection of the taxes or penalties imposed under the provisions of this Act shall not be stayed or prevented by any injunction, writ or order issued by any Court or Judge thereon. In all cases in which any taxes or penalties are required to be paid hereunder by any person, firm or corporation and the Tax Commission shall claim the payment of the taxes or penalties so assessed, or shall take any step or proceedings to collect the same, the person, firm or corporation against whom such taxes or penalties are charged, or against whom such step or proceedings shall be taken, shall, if he conceives the same to be unjust or illegal for any reason, pay the said taxes or penalties notwithstanding, under written protest, in such funds and monies as the South Carolina Tax Commission shall be authorized to receive, and upon such payment being made South Carolina Tax Commission shall make proper note that the same was paid under written protest and notify the State Treasurer that such taxes or penalties were paid under protest; that the person, firm or corporation so paying said taxes or penalties may at any time within thirty (30) days after making such payment, but not afterwards, bring an action against the South Carolina Tax Commission for the recovery thereof in any Court of competent jurisdiction and/or in proper cases in the Federal Courts and if it be determined in said action that such taxes or penalties were wrongfully and illegally collected for any reason going to the merits, then the Court before which the case is tried shall certify of record that the same were wrongfully collected and ordered to be returned with interest thereon at the rate of four (4%) per centum per annum. Whereupon the Tax Commission shall issue its warrant upon the State Treasurer for refunding the taxes and penalties so paid, which shall be paid in preference to other claims against the treasury."

[2] The pertinent portion of the repealing act is as follows:

"§ 2. § 2561, 1932 Code, Amended—Saving Clause.—That that part of Section 2561, Code of Laws 1932, Volume II, beginning with the word 'Provided' on line nine (9) and down to the end of said Section be, and the same is hereby repealed, and after repealing so much of said

with the suits which had theretofore been instituted.

The general rule, of course, is that the repeal of a statute has the effect of blotting it out as completely as if it had never existed and of putting an end to all proceedings under it. 59 C.J. 1189, 1190, and cases there cited. But it is equally well settled that a repealing act ought not be construed, if any other construction is possible, as intended to affect rights which have vested under the act repealed or as requiring the abatement of actions instituted for the enforcement of such rights. 59 C.J. 1191; Calder v. Bull, 3 Dall. 386, 1 L. Ed. 648; Eastland v. County of Clackamas 32 F. 24, 34 (Per Deady, J.); Couch v. Jeffries, 4 Burrows, 2460 (Per Mansfield, L. J.); Dash v. Van Kleeck, 7 Johns. (N. Y.) 477, 503, 5 Am.Dec. 291. In the case last cited, one of the landmarks of constitutional law, Chief Justice Kent in holding that a statute ought never be construed so as to "defeat a suit already commenced, upon a right already vested," "if it be susceptible of any other" construction, said: "The very essence of a new law is a rule for future cases. The construction here contended for, on the part of the defendant, would make the statute operate unjustly. It would make it defeat a suit already commenced, upon a right already vested. This would be punishing an innocent party with costs, as well as divesting him of a right previously acquired under the existing law. Nothing could be more alarming than such a subversion of principle. A statute ought never to receive such a construction, if it be susceptible of any other, and the statute before us can have a reasonable object and full operation without it. In the case of Beadleston v. Sprague, 6 Johns. 101, this court unhesitatingly acknowledged the principle, that a statute is not to be construed so as to work a destruction of a right previously attached. We are to presume, out of respect to the lawgiver, that the statute was not meant to operate retrospectively; and if we call to our attention the general sense of mankind on the subject of retrospective laws, it will afford us the best reason to conclude, that the legislature did not intend in this case to set so pernicious a precedent. How can we possibly suppose, that in so unimportant a case, when there were no strong passions to agitate, and no great interest to impel, that the legislature coolly meant the prostration of a principle which has become venerable for the antiquity and the universality of its sanction, and is acknowledged as an element of jurisprudence?"

There can be no question but that appellants had a vested right with respect to the moneys paid under protest pursuant to the provisions of the statute. The state took and held such moneys subject to the duty of refunding them, if the court should hold that they were not properly collected; and, in the event of such holding, claims for their repayment were given preference over all other claims against the state treasury. It was almost as though they were to be held in escrow by the state authorities to abide the determination of the suit instituted for their recovery. The repeal of the statute authorizing payment under such conditions and suit for the recovery of the amounts so paid, ought not be construed, under the authorities above cited, as destroying rights with respect to payments already made under such a statute, or as abating suits instituted for their recovery, but as applying prospectively, if such a construction is reasonably possible, which we think it is. And that it was the intention of the Legislature that the repealing statute should be construed to operate prospectively and not to affect rights acquired and actions commenced under the statute repealed, appears from the fact that the section of the statute repealed embraces a prohibition against the granting of injunctions to restrain the collection of taxes as well as the provision permitting payment under protest and suit for recovery. The intention of the repealing act was evidently to restore the right to injunctive relief for the future, and for the future to withdraw the right of payment with suit for recovery.

---

Section and after so amending it, said Section shall read as follows:

"Section 2561. If any clause, sentence, paragraph or part of Sections 2558 to 2564 shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder of Sections 2558 to 2564, but shall be confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgment shall have been rendered. No caption of any section or set of sections shall in any way affect the interpretation of Sections 2558 to 2564 or any part thereof."

■ This construction of the statute is required if violation by the Legislature of the most elementary principles of reason and justice is to be avoided. The act of 1931 had taken away the right to enjoin the collection of taxes thought to be illegal or unjust, and in lieu of that right had given, as an adequate remedy at law, the right to pay under protest and sue for recovery. To take away the right of the taxpayer to proceed with such suit, after he had been deprived of the right to proceed in equity under the promise of the state that he should have such right, and after the state had collected the disputed taxes by virtue of such promise, would be so unreasonable and unjust, that we ought not indulge the presumption that an honorable public body such as a state Legislature intended its acts to have any such effect. As said by the Supreme Court in United States v. Kirby, 7 Wall. 482, 19 L.Ed. 278, and quoted with approval in Sorrells v. United States, 287 U.S. 435, 447, 53 S.Ct. 210, 214, 77 L.Ed. 413, 86 A.L.R. 249: "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." Certainly the "sensible" construction of the repealing statute here under consideration is that it was intended to apply prospectively and not to cases where rights had accrued with respect to payments made under the statute repealed.

■ Another reason why we must interpret the repealing statute as operating prospectively, and not as taking away the rights of plaintiff with respect to moneys paid and suits instituted under the statute repealed, is that to give it the latter interpretation would unquestionably render it unconstitutional; and it is well settled that not only is an interpretation of a statute which would render it unconstitutional to be avoided, but also one which would raise a grave question as to its constitutionality. Link v. Receivers of S. A. L. Ry. Co. (C.C. A.4th) 73 F.(2d) 149, 153; Russian Volunteer Fleet v. United States, 282 U.S. 481, 492, 51 S.Ct. 229, 75 L.Ed. 473. As pointed out above, appellants have a vested right with respect to the moneys paid under the statute; and the state is forbidden by the due process and equal protection clauses of the Fourteenth Amendment to deprive them of that right. Forbes Pioneer Boat Line v. Board of Com'rs, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647.

■ The state can, of course, withdraw at any time its consent to be sued; and the right to withdraw same is not affected by the contract clause of the Constitution (article 1, § 10), or, ordinarily, by the limitations of the Fourteenth Amendment. Beers Use of Platenius v. Arkansas, 20 How. 527, 15 L.Ed. 991; Memphis & C. Railroad Co. v. Tenn., 101 U.S. 337, 25 L.Ed. 960; South & North Alabama Railroad Co. v. Alabama, 101 U. S. 832, 25 L.Ed. 973; Baltzer v. N. C., 161 U.S. 240, 16 S.Ct. 500, 40 L.Ed. 684; Lynch v. United States, 292 U.S. 571, 581, 582, 54 S.Ct. 840, 78 L.Ed. 1434. But the repealing statute here, if given the interpretation contended for by appellee, does more than withdraw the state's consent to suit. It wipes out all rights of the appellants with respect to the moneys paid under protest; for no one would contend that, in the absence of the statute, a taxpayer would have any rights with respect to tax payments already made. As there is no separate provision of the repealing statute dealing with the remedy, the entire statute would necessarily be held invalid in so far as it applied to transactions occurring prior to its passage. The question in this respect is clearly ruled by the recent decision of the Supreme Court in Lynch v. United States, supra, 292 U.S. 571, at page 586, 54 S.Ct. 840, 78 L.Ed. 1434. A statute which attempts by the same provision to destroy both a right and a remedy succeeds in destroying neither.

And, if the statute merely attempted to take away the remedy of suit against the state, a grave constitutional question would be presented under the circumstances here appearing. Suit against the state was given in lieu of hearing on injunction as a means of affording due process to the taxpayer. Whether the state, after thus defeating a hearing on injunction against its officers by consenting to be sued, could withdraw that consent without denying the taxpayer due process in violation of the Fourteenth Amendment, is a grave question which we do not feel it necessary here to decide. See, however, Graham & Foster v. Goodcell, 282 U.S. 409, 431, 51 S.Ct. 186, 75 L.Ed. 415, and Brinkerhoff-Faris Trust & Sav. Co. v. Hill, 281 U.S. 673, 679, 680, 50 S.Ct. 451, 74 L.Ed. 1107.

2. The interpretation of the taxing statute.

■ The statute here under consideration imposes two distinct taxes; one a production tax, and the other a sales tax. Subsections (a) and (b) of section 1 (Code S.C. 1932, § 2558 (a, b) impose a tax of five-tenths of a mill per kilowatt hour "upon each kilowatt hour" of electric power "manufactured or generated" within the state of South Carolina; and subsection (c) (Code S.C. 1932, § 2558 (c) imposes a tax of five-tenths of a mill upon each kilowatt hour of electric power sold within the state, with provision that there shall be credited against the sales tax the amount of the production or generation tax already paid to the state on the same current.[3] It is argued by appellants that the purpose of the act is to impose the same tax on current produced and current sold within the state; that the tax imposed on sales is on the net current delivered to the consumer after station and line or system loss has been sustained; that it is unreasonable to assume that the Legislature intended to impose the production tax upon this system loss; and that, in assessing the production tax, a proper construction of the act requires that the system loss, amounting to approximately 20 per cent. of the current generated, be eliminated from the current taxed. We were much impressed with this position upon oral argument; but, upon more mature consideration, we do not think that it can be sustained.

The trouble with the position is that, under the act in question, the generation or production tax as levied is in nowise dependent upon the sales tax, but is imposed upon each kilowatt hour of electric power "manufactured or generated," without reference to whether it is subsequently sold or lost in the operations of the producer. The system loss results in part from stepping the current up and down with transformers to different voltages and in part from loss of current from the line where transported over considerable distances. The Legislature presumably knew that these losses must occur, but did not see fit to make any allowance for them in the tax which it imposed. It did not tax producers only on the current sold by them, or on the current produced for sale, as it might have done, but on current "manufactured or generat-

---

[3] The taxing act is as follows:

"Section 1. Be it enacted by the General Assembly of the State of South Carolina: (a) That in addition to all other taxes of every kind now imposed by law, every person, firm or corporation engaged in the business of manufacturing or generating hydro-electric power in the State of South Carolina shall be subject to the payment of an excise, license or privilege tax of five-tenths of one mill upon each kilowatt hour of hydro-electric power manufactured or generated, and said tax shall be paid to and collected by South Carolina Tax Commission.

"(b) That in addition to all other taxes of every kind now imposed by law, every person, firm or corporation engaged in the business of manufacturing or generating electric power by the use of steam power in the State of South Carolina shall be subject to the payment of an excise, license, or privilege tax of five-tenths of one mill upon each kilowatt hour of electric power so manufactured or generated and said tax shall be paid to and collected by South Carolina Tax Commission.

"(c) That in addition to all other taxes of every kind now imposed by law, every person, firm or corporation engaged in the business of selling electric power within the State of South Carolina shall be subject to the payment of an excise, license, or privilege tax of five-tenths of one mill upon each kilowatt hour of electric power sold in the State of South Carolina and said tax shall be paid to and collected by South Carolina Tax Commission: Provided, That if such seller procures electric power which has been subject to the payment of the excise, license or privilege tax hereinbefore provided a credit on said tax to the amount of the excise tax already required to be paid by the person, firm or corporation generating the same within this State shall be allowed: Provided, Further, That the provisions of this Act shall not apply to the electric power manufactured or generated in another State and brought into this State until such power has lost its interstate character and immunities: Provided, further, That the provisions of this Act shall not apply to any person, firm or corporation owning and operating an electric manufacturing or generating plant of ten horse power or less, nor shall the provisions of this Act apply to industrial plants manufacturing or generating power for its own use, or for use upon its own premises by its bona fide operatives or employees but the tax shall be paid upon so much thereof as may be sold to other than its employees: Provided, further, That the provisions of this Act shall not apply to municipalities manufacturing or generating electricity for the use of its customers."

ed," without provision for any deduction whatever, on account of line or system loss or anything else. The fact that the act taxed sales of current at the same rate as it taxed current "manufactured or generated" is not controlling. The Legislature might have taxed sales at a higher rate or might not have taxed them at all, as it saw fit; and there is no ground for construing the act as taxing current produced at a less rate than the act specifies, or for exempting a part of the current produced from any taxation at all, merely because the sales tax is fixed at the same rate as the production tax. The language of the statute is clear and does not admit of construction, the office of which is to resolve and not to create ambiguity.

There is much force in the argument that the Legislature would not intend a greater tax on power generated within the state, than on power brought from without, which is measured as it comes to the customer. On the other hand, as was pointed out in the first South Carolina Power Tax Case (South Carolina Power Co. v. S. C. Tax. Comm.), 52 F.(2d) 515, 519, (D.C.); Broad River Power Co. v. Query, 288 U. S. 178, 179, 53 S.Ct. 326, 77 L.Ed. 685, the purpose of the Legislature in the imposition of the tax was primarily "to tax the generation of electric current by the hydroelectric companies which utilize the water power in the rivers of South Carolina, one of the great natural resources of that state." The Legislature may well have intended to tax the use made of these great natural resources at the rate specified in the act, without reference to the loss of current which would be sustained in transforming it to high voltage and sending it out of the state. In imposing its production tax, it was no more bound to consider that line loss on current brought in from without the state would not be reached by its sales tax, than it was bound to consider, in imposing its sales tax, that current brought in from without the state might already have been subjected to a production tax in the state of its origin.

▮▮▮ Appellants rely upon Utah Power & Light Co. v. Pfost, 286 U.S. 165, 188, 52 S. Ct. 548, 555, 76 L.Ed. 1038. In that case, however, the purpose of the statute of Utah, as manifested by its title, was to levy a tax on electric current produced "for barter, sale or exchange." The Supreme Court based its interpretation of the statute upon the limitation contained in the title and upon the fact that "the act itself in terms applies to those engaged in the production of electricity and electrical energy in the state of Idaho 'for barter, sale or exchange.'" The court said: "The producer is required to render a statement and pay a license 'on all such electricity and electrical energy so generated, manufactured or produced, measured at the place of production.' Considering these provisions and, in connection therewith, the title and the general scope and purpose of the act, the intent to impose the tax only in respect of energy generated for barter, sale, or exchange is sufficiently clear." Neither the title nor the body of the act before us contains any language limiting the tax to current produced "for barter, sale or exchange"; and we know of no principle which would justify us in reading this language into it. An excise tax can manifestly be measured by production; and the Legislature need not, although it has the power to do so, limit such tax to such part of the product as may be sold, or provide for deduction on account of such product as may be lost pending sale.

We are strengthened in the interpretation which we place upon the act by the fact that this was the interpretation placed upon it in the first South Carolina power tax case, by a court of three judges composed of two members of this court and the late Judge Ernest F. Cochran of the Eastern District of South Carolina. South Carolina Power Co. v. South Carolina Tax Commission (D.C.) 52 F.(2d) 515; Id. (D. C.) 60 F.(2d) 528. In that case the court said (52 F.(2d) 515, at page 521): "If current produced as well as sold within the state were subjected to the sales tax, such current would rest under a double burden of taxation. To avoid this and at the same time to preserve the system of taxing at the source, current which is produced within the state is taxed at the time of generation but is relieved of the sales tax, which is equal in amount, with the result that all current sold within the state, whether produced there or brought in from another state, pays exactly the same tax. *If there is any discrimination, it is in favor of the current brought in; for such current does not pay tax upon the 'line loss,' whereas the generation tax does not make provision for this loss.*" (Italics ours.) It is argued that the question before us was not raised in the first South Carolina power tax cases. This is true; but the fact that

it was not raised by any of the able counsel of the three power companies then before the court, and that it did not occur to the court, is a strong argument against its validity. The case was twice heard, and arguments were presented challenging the validity of the act from three different angles under the Constitutions of the United States and of the state of South Carolina. It was interpreted by the court for the purpose of testing it under constitutional provisions; and we do not think that we should lightly disregard the interpretation which was thus solemnly placed upon it and which was before the Supreme Court of the United States when that court, without questioning the interpretation, upheld its validity.

■ And we are further strengthened in our interpretation by the fact that this is the interpretation which has been placed upon the act from the beginning by the South Carolina tax commission, the administrative agency charged with its enforcement, and whose regulations in the performance of this· duty are given the force of law by the act itself. See section 2 of the act (Code S.C.1932, § 2559). For nearly five years the act has been thus interpreted and enforced by the tax commission; and its interpretation has not been questioned in the courts of South Carolina or by the Legislature of that state, although the Legislature has for four times since been in annual session. Under such circumstances we ought not place a different interpretation upon the act unless satisfied that the one adopted by the tax commission is clearly wrong. As said by Mr. Justice Cardozo in Fox v. Standard Oil Co. of New Jersey, 294 U.S. 87, 93, 55 S.Ct. 333, 337, 79 L.Ed. 780: "Reinforcing this token [the rejection of an amendment by the state senate] is the contemporaneous interpretation of the statute by the tax commissioner of the state, the administrative agent charged with its enforcement. Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397. We give to such construction 'respectful consideration,' though we have power to disregard it. United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588; Fawcus Machine Co. v. United States, supra. The complainant was at liberty to maintain a suit in the state courts, where the meaning of the statute could have been determined with finality. It chose to have recourse to the courts of the nation. In such circumstances we are charged with a duty of independent judgment (Siler v. Louisville & Nashville R. Co., 213 U.S. 175, 194, 29 S. Ct. 451, 53 L.Ed. 753; Hurn v. Oursler, 289 U.S. 238, 243, 53 S.Ct. 586, 77 L.Ed. 1148), but, in default of other tests, we lean to an agreement with the agents of the state."

3. The question of constitutionality.

■ Little need be said with respect to the constitutional validity of the act, which was upheld by the Supreme Court in Broad River Power Co. v. Query, 288 U.S. 178, 53 S.Ct. 326, 77 L.Ed. 685, against attack under the Fourteenth Amendment. While the opinion of the Supreme Court deals with only two of the questions raised under the Fourteenth Amendment, the opinions of the lower court deal with a number of other questions raised under that amendment, and we refer to those opinions for a fuller expression of our views as to the interpretation and constitutionality of the act. See South Carolina Power Co. v. South Carolina Tax Comm. (D.C.) 52 F.(2d) 515; Id. (D.C.) 60 F.(2d) 528. The only difference in the constitutional argument made here and those presented in that case, is that it is now argued that the act as we have construed it discriminates against domestic power companies in that the sales tax imposed upon power brought into the state and sold, power sold by industrial plants, and power sold by municipalities, is measured by power actually delivered so that line or system loss is not taxed. The answer to this is that only the sales tax is imposed in the cases with which comparison is made; and it is manifestly no objection to a production tax that a sales tax is levied upon a different basis. The propriety of treating power companies, for purposes of the production tax, as in a class different from industrial plants which develop power for their own use and that of their employees and from municipalities, was clearly pointed out in the Broad River Power Company Case, supra.

There was no error, and the judgment sustaining the demurrers and dismissing the actions will be affirmed.

Affirmed.