INTERSTATE COMMERCE COMMISSION v. COLUMBUS & G. RY. CO. et al.

No. 11364.

Circuit Court of Appeals, Fifth Circuit.

Jan. 25, 1946.

Louis I. Dailey, Atty. for Interstate Commerce Commission, of Little Rock, Ark., Gregory U. Harmon, Chief Enforcement Atty., I.C.C., of Washington, D.C., Toxey Hall, U. S. Atty., and John W. Savage, Asst. U. S. Atty., both of Jackson, Miss., for appellant.

Robert C. Stovall, of Okolona, Miss., and W. H. Watkins, of Jackson, Miss., for appellees.

Before HOLMES, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

The appellee Columbus and Greenville Railway Company, operates a railroad from Columbus, Mississippi, to Greenville in the same state, a distance of 168 miles. It also has a certificate from the Mississippi Public Service Commission authorizing it to transport commodities from Greenville, Mississippi, to Grace and Glen Allen, Mississippi, and points between, as a common carrier for hire by motor vehicle. But the appellant alleges that the appellee, in hauling bales of cotton and cotton seed from gins, in the area covered by its state certificate, to a warehouse and compress in Greenville, Mississippi, was engaged in interstate commerce without having filed a tariff or schedule of rates with the Interstate Commerce Commission, as is required

by a carrier engaged in interstate commerce by motor vehicle.

The Interstate Commerce Commission [which will be referred to herein as "the Commission" or as "the Plaintiff"] sought to enjoin the Railway Company and one James Thomas Garrard from a continuation of such carriage without complying with what it alleges to be the requirements of the Federal law.

Garrard was the owner of a dozen trucks, and during the cotton picking, ginning, and marketing season—which is from the middle of August to the middle of December—the Railway Company engaged Garrard and his trucks to conduct, in its behalf, the seasonal business of transporting cotton seed from gin to warehouse and compress. At the end of the season Garrard's services in connection with the transportation of the cotton ceased until the next season. The cotton and seed were hauled for the farmer who grew the cotton. In connection with the warehouse in Greenville, to which the cotton was delivered, there was a compress. Upon the delivery of the bales of cotton to the warehouse negotiable warehouse receipts, issued by the warehouse pursuant to Federal statutes and regulations, were delivered to the owner. These receipts could be used in effecting a sale or in procuring a loan with the cotton as security. No contention was made that the defendants were engaged in interstate commerce in the handling of the cotton seed, but only as to the cotton in bales. The compress, in order to conserve space in the warehousing and in shipping, by mechanical pressure, reduced the size of the cotton bales. Samples of the lint or staple were taken, the cotton was graded, and sales would later be made according to the grade as determined from such sample.

If a planter desired, he could leave his cotton at the warehouse indefinitely. He could also take it back to his plantation or store it elsewhere, but as a rule the cotton raiser sold his cotton to local buyers who usually accumulated a large stock of various grades so as to be able to fill such orders as they received from factories, or other purchasers, of any grade desired. Substantially all of the cotton was sold by the local buyers to out-of-state purchasers, the cotton meanwhile remaining in the warehouse until it was sold and shipping orders were received. Some of the cotton brought by the defendant as a mo-tor carrier would be shipped from the warehouse over the Y. & M. V. Railroad, but approximately seventy-five per cent of the cotton brought in by the trucks of the defendant ultimately was shipped to points in North Carolina over the railroad of the defendant.

The Court below found that the cotton remained in the warehouse, after delivery by the defendant, for a period of from six to eight months before it moved out over the railroads in interstate commerce. It also held that the transportation by motor vehicle of the cotton from the gin to the warehouse, or compress, was purely intrastate, and denied the injunction sought by the plaintiff.

It also was shown that the defendant, as a motor vehicle carrier, issued to each farmer whose cotton it hauled to the warehouse a certificate providing that the owner, upon making a claim to the railroad, would be entitled to a credit of four cents per hundred pounds—approximately twenty cents a bale—for any of his cotton if it were subsequently shipped out over its line of railroad. It is undisputed, however, that the Y. & M. V. Railroad would make the same payment to the owner for cotton shipped out over its line of railroad even though the cotton had not been brought to the warehouse by the Y. & M. V.

This case, however, does not involve the legality of the so-called "cut-backs." We are not called on to determine whether they are lawful provisions in the tariffs of these railroads, or either of them, but the fact of their use by defendant is urged upon us in an effort to show an attempt by the defendant to establish a through rate. The evidence fails to show a through rate but on the contrary shows that this "cutback" was given regardless of where the cotton shipment originated. The only requisite was that the shipment must originate off the line of either of the railroad carriers.

Counsel for the appellant concedes that these do not constitute milling-in-transit shipments. This must, of necessity, be conceded because the cotton is brought in by motor vehicle for the farmer. Its destination is Greenville. Its ultimate destination is unknown. It had no consignee. It is merely to be stored in the warehouse until the farmer sells it to a cotton buyer, the cotton buyer sells it to the ultimate consumer, and the latter orders its shipment. When it goes out over the railroad it will

be under an entirely new bill of lading in which the farmer—the shipper into the warehouse—will be in no wise interested, either as owner, shipper, or consignee. Moreover, the cotton which the defendant brought into the warehouse by motor vehicle may not even move out over its railroad, but may be shipped out over the lines of other carriers.

We are not engaged here in undertaking to construe an Act of Congress that deals with matters and things that may affect interstate commerce, nor are we undertaking to determine the scope of the power of Congress to regulate such matters and things. We are construing an Act in which Congress expressly provided that the Interstate Commerce Commission should not have the power to interfere with the exclusive exercise by the state of the power to regulate intrastate commerce by motor vehicle, Title 49 U.S.C.A. § 302(b), and which also expressly refused power to the Interstate Commerce Commission to regulate motor vehicles engaged exclusively in carrying agricultural commodities even though such vehicles were carrying such commodities in interstate commerce. Title 49 U.S.C.A. § 303(b).

Counsel for the Commission contends, however, that the provision in the statute exempting vehicles carrying agricultural commodities is an exemption that runs to the vehicle and does not have the effect of freeing from the regulation the carrier who uses such vehicle for such purpose. They insist that even though the vehicles, when used by the railroad defendant here in the operation sought to be enjoined, carry only agricultural products—cotton and cotton seed—nevertheless, after the end of the seasonal operations of transporting cotton from gin to warehouse the defendant, Garrard, uses the vehicles in some other part of the state in the transportation of other commodities. Defendant urges that this argument loses sight of the fact that it is the four-month operation of the defendant Railroad in hauling cotton and cotton seed from gin to warehouse for and on behalf of the railroad that the Court is called upon to enjoin, and not the operations of defendant Garrard in some other section of the country for someone else during the other eight months of the year. So far as the defendant Railway Company is concerned, these vehicles haul for it only agricultural products. We do not think an answer to this question is necessary to a

decision, but we are of the view that even if the statute exempting vehicles exclusively engaged in carrying agricultural commodities from regulation does not exempt the operator, it shows an intent on the part of Congress to confine the power of the Interstate Commerce Commission in the regulation of motor vehicular transportation in interstate commerce to a much narrower scope than is often afforded governmental agencies in the regulation of other activities and phases of interstate commerce.

We agree with the lower Court that the motor vehicular transportation of the cotton from the gin to the warehouse was not in interstate commerce. See Federal Compress Co. v. McLean, 291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622; Chassaniol v. City of Greenwood, 291 U.S. 584, 54 S.Ct. 541, 78 L.Ed. 1004. Atlantic Coast Line R. Co. v. Standard Oil Co. of Ky., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270; Galveston Truck Line Corp. v. State, Tex.Civ.App., 123 S. W.2d. 797.

The judgment of the lower court is affirmed.